VAIDIK, Chief Judge,
dissenting.
The majority concludes that the trial court erred by awarding visitation to Scott and Angela Ubelhor (“Grandparents”). Because I believe the trial court did not err, I respectfully dissent.
Justin Ubelhor, Grandparents’ son, committed suicide in 2010. Less than two months later, Brooke Neuhoff (“Mother”) *763 gave birth to their son, C.N. For nearly three years after C.N. was born, C.N. and Mother enjoyed, by all accounts, a healthy and loving relationship with Grandparents. Grandparents were present at C.N.’s birth and baptism. They attended C.N.’s birthday parties and spent time with C.N. during the holidays and at other family celebrations. And every Sunday, Mother would bring C.N. to Grandparents’ home, where he would spend the day with Grandparents.
Things began to change in January 2013, when Mother’s friend told Grandparents that Mother intended to terminate their relationship with C.N. because they were “low-life peoplef ],” “bad influences,” and “[didn’t] deserve to be around [C.N.].” Tr. p. 16. Mother later denied saying such things. In February, GraUdparents filed a petition for grandparent visitation. Appellant’s App. p. 11-12.
For three weeks after Grandparents filed their petition, Mother continued to bring C.N. to Grandparents’ home for Sunday visits. But when Mother suddenly cut off all contact between Grandparents and C.N. in March 2013, Grandparents filed an emergency petition for visitation. Id. at 13-14. The trial court denied the emergency request and set the matter for a hearing in August 2013.
At the hearing, Grandmother described the relationship between C.N. and Grandparents:
It was amazing. We got to see [C.N.] every weekend. Sometimes we would actually see him more than one day. Sometimes, if we would get lucky, we’d have him Friday, Saturday, and Sunday. If he would get sick, there would be times that my daughter or I stayed home with him because [C.N.’s maternal grandmother] had to work and [Mother] had school. It was an amazing ... I mean, every weekend we had this little boy.
Tr. p. 12-13. When C.N. visited, Grandparents would make his favorite breakfast, watch movies, play with blocks and puzzles, and play outdoors on the swing set. Id. at. 18. Grandmother described C.N. as a loving and affectionate “papa’s boy” who always wanted his grandfather’s attention. Id. at 20.
Mother testified that she stopped allowing Grandparents to visit with C.N. because he acted out after a visit with them in March 2013. Id. at 67. She also testified that C.N. had four accidents at day care following his last visit with Grandparents, and after she picked him up from day care, Mother noticed three bruises on his back. Id. at 51-52, 68. Mother admitted that she did not know the source of the bruises and never asked Grandparents or C.N.’s day-care provider about them. Id. at 53, 75. Mother also noted other concerns, including Grandfather’s two criminal convictions from twelve years earlier and both Grandparents’ use of prescribed medications; however, Mother acknowledged that she knew these things before C.N.’s birth and nonetheless fostered C.N.’s relationship with Grandparents. Id. at 70-74. When asked what visitation she would allow in the future, Mother said Grandparents could have supervised visitation with C.N. once a month, for four to six hours.
Mother’s therapist also testified. She had consulted the guardian ad litem (GAL) assigned to the case, and neither had concerns about Grandparents spending time with C.N. Both recommended that Grandparents be granted visitation. Id. at 129-30.
The trial court ruled in Grandparents’ favor, and Mother appealed. On appeal, we remanded for the trial court to enter the required findings and conclusions. On remand, the trial court articulated its rea- *764 soiling for granting Grandparents visitation with C.N. The court discussed C.N.’s relationship with Grandparents and Mother’s concerns about Grandparents:
[Grandparents] love [C.N.] very much. They are [C.N.’s] link to his father, and that is a big part of who [C.N.] is. [C.N.] has had a happy, healthy relationship with [Grandparents] during the past 2 years and 9 months.
⅜ ⅜ ⅜ ⅞: ⅜ ⅜
Prior to the filing of the Petition[,] [Mother] never complained of the manner in which [C.N.] was treated in [Grandparents’] home, except for the occasional sweets given to him. [C.N.] had never been injured. There was no physical discipline. [Mother’s] only complaint concerning [C.N.’s] care and safety was registered after the Petition had been filed, at which time [Mother] terminated [C.N.’s] relationship with [Grandparents].
Revised Order p. 5-6 (formatting altered). The court found that there was no evidence that C.N. had been harmed while in Grandparents’ care:
There is no evidence that [Grandparents] were responsible for [C.N.’s] unusual behavior on March 17, 2013, the potty accidents at day care, or the bruising discovered during the bath on March 18, 2013. The[se] events ... were isolated in nature, when considered in the context of the positive and flourishing relationship enjoyed by [C.N.] and [Grandparents] over the past 2 years and 9 months.
* * * * * *
[Mother] did not discuss [C.N.’s] unusual conduct with [Grandparents] to determine if something had happened during visitation ... that was responsible for the conduct. [Mother] assumed that something had happened and as a result terminated visitation. [Mother’s] decision was based, in part, on speculation.
Id. at 9 (emphasis added, formatting altered).
The court also acknowledged that Mother was a fit parent but expressed concern about whether she would allow C.N. to have a relationship with Grandparents absent a court order. See id. at 10 (“[Mother] told the GAL that she prefers [Grandparents] not have any contact with [C.N.] at this time.”); 10-11 (“There is no reason, based on the evidence introduced at the trial of this cause, to believe that [Mother] will voluntarily reestablish the grandparent-grandchild relationship without a court order.”). The court also noted that although Mother expressed concern about C.N.’s safety with Grandparents, the GAL and Mother’s therapist did not share these concerns; in fact, they recommended that C.N. spend time with Grandparents. Id. at 11. Finally, the court concluded:
[Mother’s] testimony of her concerns about [Grandparents] is in conflict with her actual behavior over the past two years and nine months while fostering and promoting [C.N.’s] relationship with [Grandparents]; the decline in her relationship with [Grandparents] providefd] an excuse to stop the grandparent visitation; and, there was no effort on [Mother’s] part to discuss and resolve any of the purported concerns she now expresses at the time the concerns allegedly occurred.
[Mother’s] termination of the flourishing and healthy relationship between [C.N.] and [Grandparents] may affect [C.N.’s] emotional development and the bond established beginning with his birth [and continuing] to the date on which she terminated the visitation, especially in light of the recommendations made by the GAL and [Mother’s therapist]. [Mother’s] decision interrupted a routine *765 [C.N.] enjoyed[,] which was not in his best interests.
Id. The court found that Grandparents had presented sufficient evidence to “overcome the weight of [Mother’s] decision-making authority,” and had established that visitation was in C.N.’s best interests. Id. at 12.
Indiana’s Grandparent Visitation Act requires specific findings of fact and conclusions. See Ind.Code § 31-17-5-6; In re Visitation of 983 N.E.2d 583, 585 (Ind.2013). The reviewing court applies “the two-tiered Indiana Trial Rule 52 standard of review” — we first determine whether the evidence supports the findings, and then whether the findings support the judgment. 983 N.E.2d at 585 (citations omitted). “We set aside findings of fact only if they are ‘clearly erroneous,’ deferring to the trial court’s superior opportunity ‘to judge the credibility of the witnesses.’ ” Id. (citations omitted). The trial court’s judgment is clearly erroneous when the findings do not support the judgment, or “when the trial court applies the wrong legal standard to properly found facts.” Id. (citations omitted).
Four factors, called the McCune factors, guide trial courts in the grandparent-visitation context. When determining whether to grant grandparent visitation, a trial court must address the following:
(1) a presumption that a fit parent’s decision about grandparent visitation is in the child’s best interests (thus placing the burden of proof on the petitioning grandparents);
(2) the “special weight” that must therefore be given to a fit parent’s decision regarding nonparental visitation (thus establishing a heightened standard of proof by which a grandparent must rebut the presumption);
(3) “some weight” given to whether a parent has agreed to some visitation or denied it entirely (since a denial means the very existence of a child-grandparent relationship is at stake, while the question otherwise is merely how much visitation is appropriate); and
(4)whether the petitioning grandparent has established that visitation is in the child’s best interests.
Id. at 586 (citing McCune v. Frey, 783 N.E.2d 752, 757-59 (Ind.Ct.App.2003)).
“The first three [McCune] factors implement the constitutionally protected right of fit parents to make child rearing decisions, and reflect the significant burden of proof grandparents must carry to override those decisions.” Id. There is no dispute that Mother is a fit parent; thus, her decision regarding grandparent visitation is presumed to be in C.N.’s best interests. The trial court acknowledged this presumption but found that Grandparents had rebutted it, and I agree.
It is well settled that a trial court is required to give special weight to a fit parent’s decision regarding grandparent visitation. But this requirement does not mean that a trial court must take at face value any explanation given by a parent. K.L. v. E.H., 6 N.E.3d 1021, 1032 (Ind.Ct.App.2014) (citation omitted). “The trial court must exercise the same duties it has in any other matter pending before it, namely, the duties of weighing the evidence and judging witness credibility.” Id. “[I]t is the trial court’s prerogative to listen to the evidence and determine whether a parent’s alleged justification for denying or restricting visitation with grandparents holds water.” Id.
The trial court ultimately determined that Mother’s justification for denying Grandparents visitation did not, in fact, hold water. The trial court’s lengthy findings, summarized here, explain why this is so:
*766 • By all accounts, C.N. and Grandparents enjoyed a healthy and happy relationship and an established a routine of visitation for nearly three years before Mother terminated visitation
• Mother disrupted this routine and threatened C.N.’s emotional health by cutting off all contact between C.N. and Grandparents
• Grandparents offer C.N. a link to his deceased father
• There was no evidence that Grandparents were responsible for C.N.’s change in behavior after a March 2013 visit
• Mother’s other concerns — such as Grandfather’s criminal convictions from twelve years ago and Grandparents’ authorized use of prescription medication — existed well before C.N.’s birth, and Mother fostered a relationship between C.N. and Grandparents despite this
• The GAL and Mother’s therapist had no concerns about C.N.’s safety in Grandparents’ care and recommended that Grandparents be granted visitation with C.N.
Citing the “amazing family relationship filled with love and affection” that C.N. enjoyed with Grandparents before this litigation, the court also determined that visitation was in C.N.’s best interests. Revised Order p. 3-4, 12. Notably, although Mother testified at trial that she would be willing to allow visitation under limited circumstances, the trial court found that “there [was] no reason ... to believe that [Mother] will voluntarily reestablish the grandparent-grandchild relationship without a court order.” Id. at 10-11. In light of the foregoing evidence, and deferring to the trial court’s superior opportunity to judge the credibility of the witnesses, I would find that the court did not abuse its discretion in granting Grandparents’ petition.[3]
Finally, the majority discusses Grandparents’ decision to file a petition for visitation at length. Op. pp. 760-61. The majority states that “by filing a lawsuit against Mother, Grandparents contributed to the parties’ discord and did nothing to make Mother feel more comfortable about leaving the child alone in their care.” Id. at 14. This sentiment gives me pause. At the time they filed their petition, Grandparents had no legal right to spend time with C.N., the only child of their deceased son. To Mother’s credit, she had previously allowed Grandparents to spend time with C.N., but Mother’s relationship with Grandparents had rapidly deteriorated in the months leading up to Grandparents’ filing. Making matters worse, Grandparents heard that Mother intended to terminate their relationship with C.N. A grandparent-visitation petition was Grandparents’ exclusive means by which to safeguard their right to continue their relationship with their grandson. The fact that Grandparents chose to take this action should not be held against them.
For these reasons, I respectfully dissent and would affirm the trial court.

. As our Supreme Court stated in M.L.B., the “Grandparent Visitation Act contemplates only occasional, temporary visitation that does not substantially infringe on a parent’s fundamental right to control the upbringing, education, and religious training of their children.” 983 N.E.2d at 586. The visitation awarded in this case — two hours per week at first, and eight hours every other Sunday at most — is of the type contemplated by the Act.